SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB # 965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:24-cr-00242-SI-02 |
| v. | **GOVERNMENT'S MEMORANDUM IN SUPPORT OF DEFENDANT'S** |
| MAUDE A. MELTON, | **CONTINUED PRETRIAL DETENTION** |
| Defendant. | |

The United States of America, through Scott E. Bradford, United States Attorney for the District of Oregon, and Scott M. Kerin, Assistant United States Attorney, hereby asks the Court to continue the defendant's detention pending trial.

**A.      Factual and Procedural Summary.**

The defendant is currently in custody in the District of New Jersey following her arrest on a warrant that was issued by the U.S. District Court for the District of Oregon following her indictment in federal court.  The defendant is currently charged in a four-count Superseding Indictment with:

**Government's Memorandum in Support of Continued Pretrial Detention          Page 1**

Count 1:    Conspiracy to Distribute and Possess with Intent to Distribute a Controlled

Substance – Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A), and 846,

Count 2:    Distribution of a Controlled Substance – Fentanyl (between January 23,

2024, and February 20, 2024), in violation of 21 U.S.C. § 841(a)(1),

841(b)(1)(C), and 18 U.S.C. § 2.

Count 3:    Distribution of a Controlled Substance – Fentanyl (between January 25,

2024, and February 8, 2024), in violation of 21 U.S.C. § 841(a)(1),

841(b)(1)(C), and 18 U.S.C. § 2.

Count 4:    Distribution of a Controlled Substance – Fentanyl (between April 18,

2024, and April 26, 2024), in violation of 21 U.S.C. § 841(a)(1),

841(b)(1)(C), and 18 U.S.C. § 2.

On Count 1 the maximum sentence a court could impose is a term of life imprisonment and a potential 10-year mandatory minimum sentence. Counts 2 through 4 carry a maximum 20-year term of imprisonment.

The charges stem from her involvement with her former boyfriend in selling fentanyl on both the dark net and Telegram (an encrypted messenger service). Homeland Security Investigations (HSI), the Portland Police Bureau (PPB), and the U.S. Attorney's Office for the District of Oregon initiated this investigation in January 2024, after an HSI agent observed a post on a dark net forum where a vendor using the moniker "WRSEH10" was advertising free samples of "China White Synthetic Heroin." "China White Synthetic Heroin" is often used as a description for fentanyl or fentanyl analogues. In connection with the advertisement an individual posted a comment stating that a friend of theirs had obtained a free sample from

**Government's Memorandum in Support of Continued Pretrial Detention          Page 2**

WRSEH10 and then overdosed and died as a result.  The vendor WRSEH10, in turn, wrote an apology about the overdose.

After reading the post, Investigators set out to identify who was running WRSEH10. Through the course of the investigation, which was run from Portland, Oregon, Investigators conducted three controlled buys of "China White Synthetic Heroin" from WRSEH10 and paid for the drugs using cryptocurrency.  Each controlled drug buy resulted in WRSEH10 sending fentanyl to an undercover mailbox in Portland, Oregon.  The three controlled drug buys resulted in the seizure of approximately 26.5 grams of fentanyl.  Through the course of the investigation, which included cryptocurrency tracing, Investigators were able to determine that Mark Eager and Maude Melton, residents of Kearny, New Jersey, were working together and operating as the vendor WRSEH10.  Screen shots of some of their postings, including the average weight of the packages of fentanyl that they were selling and a warning of its dangers, are below:



///

///



On May 29, 2024, based on probable cause that the defendants were selling fentanyl, Investigators applied for, and a U.S. Magistrate Judge in New Jersey granted, search warrants for two residences associated to defendants in Kearny, New Jersey.

On June 11, 2024, the federal search warrants were executed.  The two defendants were found living together inside one of the residences located on Laurel Avenue, in Kerney, New Jersey.  This residence on Laurel Avenue was defendant Melton's parents' residence.  Both defendants were detained after they were found coming out of the same bedroom within the residence.  Inside the defendants' bedroom Investigators found and seized approximately 361 grams of powdered Fentanyl, 16 counterfeit M30 Pills, drug ledgers, operating instructions for the WRSEH10 vendor site, cellular phones, two computers, and packaging material consistent with what was used to deliver the fentanyl in the three controlled purchases mentioned above. Pictures of the seized fentanyl and packaging material are below:

///

**Government's Memorandum in Support of Continued Pretrial Detention**          **Page 4**





///

///

///

**Government's Memorandum in Support of Continued Pretrial Detention**            **Page 5**



Defendant Eager was arrested and advised of his constitutional *Miranda* rights.  After acknowledging that he understood his rights, defendant Eager was interviewed by Investigators. Defendant Eager admitted that he was the vendor WRSEH10 who operated on both the "SuperMarket" Dark Net Site, as well as the Telegram shop.  Defendant Eager also admitted that as a result of his online sales of fentanyl he had earned approximately $42,000 in cryptocurrency, which Investigators were able to locate and seize.  Defendant Eager also admitted that he was using fentanyl as well.  At the time of defendant Eager's arrest he had an active warrant for robbery issued by the Hudson County, New Jersey Sheriff's Department in January 2023. Defendant Eager was arrested and a federal criminal complaint was obtained in the District of Oregon.

Defendant Melton was also advised of her constitutional *Miranda* rights.  Defendant Melton at first invoked her rights but later asked the Investigators if she could still make a statement.  The Investigators again advised defendant Melton of her constitutional *Miranda* rights and this time she told them that she helped defendant Eager operate the WRSEH10 vendor site "like a business."  She also told the Investigators that she would assist in the packaging of

**Government's Memorandum in Support of Continued Pretrial Detention**          **Page 6**

the drugs and was responsible for placing fentanyl orders into the mail for shipment to their customers. She also admitted that she provided her bank accounts to be used to convert cryptocurrency, that was received from their customers, into fiat currency (regular U.S. Currency). Both defendants Eager and Melton had the WRSEH10 cryptocurrency wallet on their phones. Defendant Melton was released at the scene.

HSI Portland identified that the fentanyl vendor WRSEH10 operated on the Dark Net Market sites "SuperMarket" and "Archetyp" distributing powdered fentanyl using the U.S. mail system. WRSEH10 accepted payment via the cryptocurrencies Bitcoin (BTC) and Monero (XMR). The darknet market Archetyp was subsequently taken down and seized by law enforcement. From the Archetyp records alone, Investigators determined that the vendor WRSEH10 sold 3,876 packages containing approximately 290.6 grams of fentanyl, for which they received $153,313.59 in revenue.

On June 18, 2024, the co-defendant Mark Eager was indicted in the District of Oregon. On September 4, 2024, the federal grand jury in Oregon returned a Superseding Indictment that added defendant Melton to the indictment. Defendant Eager is in custody in Oregon pending trial.

Following the Superseding Indictment, an arrest warrant was issued for defendant Melton and on September 5, 2024, the Oregon Federal Public Defender's Office was notified in an effort to have the defendant turn herself in on the warrant. She did not turn herself in and the government does not know what, if any, conversations that office or any attorney ever had with her.

Given the outstanding status of defendant Melton's arrest warrant, in November 2025, Investigators started conducting surveillance on her parents residence in an effort to locate her.

**Government's Memorandum in Support of Continued Pretrial Detention          Page 7**

On November 5, 2025, around 10:10 a.m., Investigators visited her parent's house on Laural Avenue, in Kearney, New Jersey, which was the same house at which she and her co-defendant were originally detained during the execution of the search warrant. Special Agent (SA) Fusco knocked on the side door of the house and did not receive an answer. Task Force Officer (TFO) Marquez then proceeded to knock on a window, which defendant Melton's father answered and he was told to come around to the side door. SA Fusco was standing at the side door with his badge displayed around his neck when he saw through the side door window that defendant's father opened the apartment door and then shut it. Approximately ten seconds later defendant's father opened the apartment door again and proceeded down the small staircase towards SA Fusco. While defendant's father was walking down the stairs SA Fusco was able to see a small in stature person run by the open apartment door. The person appeared to be wearing a dark colored hood and the agents believed this was the defendant Melton. The woman was seen running from the direction of her bedroom towards the front of the apartment.

SA Fusco asked defendant's father if defendant Melton was home and he stated she was not and that she hadn't stayed there in a while. He also stated that he hasn't talked to her. Both of these statements turned out to be false. SA Fusco asked for consent to search the residence to see if defendant Melton was there and the defendant's father gave them consent to search. Investigators searched the residence and did not find the defendant. Defendant's mother was also present and kept telling Investigators that the defendant was not there and she hasn't seen or talked to her. This also turned out to be false. SA Fusco then proceeded to tell the defendant's father that he saw the defendant run by when he opened the door and if he was hiding her or helping her evade law enforcement there is the potential for him to get in trouble. At this point

///

**Government's Memorandum in Support of Continued Pretrial Detention          Page 8**

defendant's father rolled his shoulders forward, looked down, and then said that the defendant was there and she ran to the front of the apartment and was wearing a dark colored bath robe.

Investigators continued to search the apartment and opened the front door which led to a common foyer.  There is another door located in the foyer which is a common door that leads to a staircase for access to the second and third floor apartments.  SA Fusco attempted to open the door but it was locked.  Defendant's father informed SA Fusco that door "is never locked because no one has a key to it."  Defendant's father knocked on the door and told the defendant to come out.  She did not.

After multiple attempts to open the door SA Fusco breached the door and proceeded up the staircase.  Investigators still could not locate the defendant within the residence. Investigators stayed at the defendant's residence while other investigators searched the nearby streets.  SA Fusco went to a neighbor's house approximately three houses away to review doorbell camera footage to see if the defendant left the area.  While standing on the porch of the neighbor's house SA Fusco looked towards the defendant's residence and saw what appeared to be a dark colored hood on the roof of the house.  Another agent called defendant Melton's name and the hood disappeared out of sight.

At the same time SA Fusco was at the neighbor's house the third floor tenant of in defendant's residence came home and informed investigators that when she left the house that morning, she left her apartment door unlocked.  SA Fusco checked that door during the search of the common stairwell and it was locked.

At this point investigators proceeded up a different staircase on the side of the house and gained access to the roof via a window.  The defendant was then found to be sitting on the peak of the house.  Investigators commanded the defendant to come down, and she did.  Agents then

**Government's Memorandum in Support of Continued Pretrial Detention          Page 9**

placed her in custody without further incident at approximately 11:49 a.m.  During a search

incident to arrest the defendant was found to be in possession of a silver metal case that

contained numerous wax folds containing a white powdery substance.  The white powdery

substance was later field tested and came back positive for fentanyl, with a total weight of

approximately 18.91 gross grams, to include packaging.

Defendant is currently in custody in New Jersey pending transfer to the District of

Oregon.  Based upon the nature of the charges, defendant's personal history and characteristics,

and her attempt to evade apprehension the government seeks the defendant's continued detention

as a danger to the community and a risk of nonappearance.

**B.  Applicable Law.**

**1.  Rules of Evidence Do Not Apply at Detention Hearing**

The Federal Rules of Evidence do not apply in pretrial detention proceedings.  Fed. R.

Evid. 1101(d)(3); 18 U.S.C. § 3142(f).  Accordingly, both the government and the defense may

present evidence by proffer or hearsay.  *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir.

1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925-26 (N.D.Cal. 2007).

**2.  Rebuttable Presumption of Detention**

Under the Bail Reform Act, 18 U.S.C. § 3142, *et seq.*, which governs the detention of a

defendant pending trial, the Court shall order a defendant detained if, after a hearing, it finds that

"no condition or combination of conditions will reasonably assure the appearance of the person

as required and the safety of any other person and the community."  Generally, the United States

bears the burden of establishing danger to the community by clear and convincing evidence; risk

of flight need only be proved by a preponderance of the evidence.  *United States v. Aitken*, 898

F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757.

**Government's Memorandum in Support of Continued Pretrial Detention**          **Page 10**

Where there is probable cause to believe that the defendant committed a Title 21 narcotics offense and the maximum penalty for that offense is a term of imprisonment of 10 years or more, or a violation of Title 18, United States Code, Section 924(c), the law creates a presumption that no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community.  18 U.S.C. § 3142(e)(3)(A) and (B).  In such a case, the burden of proof shifts to the defendant to rebut the presumption of detention.  *United States v. Carbone*, 793 F.2d 559, 560 (3rd Cir. 1986).  The criminal charges in this case create a presumption of pretrial detention.

Concern about the safety of the community is not limited to concerns about violence; rather it is the *risk* that a defendant will continue committing crimes while on release, such as drug dealing, that warrants their continued detention as a danger to the community:

> [T]he language referring to the safety of the community refers to the danger that the defendant **might** engage in criminal activity to the detriment of the community.  The committee intends that the concerns about safety be given a broader construction than merely danger of harm involving physical violence.  This principal was recently endorsed in *United States v. Provenzano and Andretta*, in which it was held that the concept of 'danger' . . . extended to nonphysical harms such as corrupting a union.  **The committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."**

S.REP. NO. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N 3182, 3195 (Bail Reform Act)(emphasis added); *see also United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir.1989)(Congress has determined "that drug offenders pose a special risk of flight and dangerousness to society.").

The Senate Report further explained *why* they created the presumption that there was no condition or combination of conditions of release that will reasonably assure the appearance of drug dealers or the safety of the community:

**Government's Memorandum in Support of Continued Pretrial Detention          Page 11**

> These [the crimes outlined in 18 U.S.C. § 3142(e)] are serious and dangerous federal offenses. The drug offenses involve either trafficking in opiates or narcotic drugs, or trafficking in large amounts of other types of controlled substances. It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, **because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism**.

S.REP. NO. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3203 (Bail Reform Act) (emphasis added).

The presumption in favor of detention, as both a flight risk and danger to the community, does not vanish if a defendant comes forward with some evidence to rebut it, but rather it remains an evidentiary factor to be evaluated. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985); *see also United States v. Rueben*, 974 F.2d 580, 586 (5th Cir.1992); *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir.1991); *United States v. Hare*, 873 F.2d 796, 798 (5th Cir.1989). Were the presumption to vanish, "courts would be giving too little deference to Congress' findings regarding this class." *United States v. Martir*, 782 F.2d 1141, 1144 (2nd Cir.1986).

The degree of danger posed by a defendant charged with narcotics trafficking is critical. *United States v. Leon*, 766 F.2d 77, 81 (2nd Cir. 1985). To determine that degree and decide if a defendant should be detained pending trial, a judicial officer must look to the nature and circumstances of the crime charged; whether the crime involved violence or drugs; the personal history of the person, the seriousness of the danger posed by the person's release; and, the evidence of the individual's guilt. *Id.* Evidence of defendant's family ties in the area, residence in the community and employment history should have no bearing on the court's determination of dangerousness and cannot rebut the presumption that arises under the statute. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 24 (1983) (minimizing community ties and pointing to the "growing

**Government's Memorandum in Support of Continued Pretrial Detention          Page 12**

evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and has no correlation with the question of the safety of the community.").

If the defendant proffers evidence to initially rebut the presumption of dangerousness or risk of non-appearance, the Court should then examine the following four factors in deciding whether release is appropriate:

(1)    the nature and circumstances of the offense charged, including whether the offense . . . involves . . . a controlled substance . . . ;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including –

    (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and

    (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal . . . ; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

## C.    Factors Supporting Detention.

The Court should detain the defendant pending trial as both a danger to the community and a risk of nonappearance. The defendant was involved in selling fentanyl. Fentanyl is an incredible addictive, destructive, and deadly drug that has unleashed untoward devastation across the country. Furthermore, when the Investigators went looking for the defendant, she actively tried to evade apprehension by climbing out onto the roof of her residence in an effort to hide from them. Her parents, despite knowing she was there, told Investigators that she wasn't and

**Government's Memorandum in Support of Continued Pretrial Detention**        **Page 13**

that they had not seen her for some time.  This was not true and calls into question their ability to now serve as an appropriate placement for the defendant.  Furthermore, at the time she was arrested the defendant possessed fentanyl – whether it was for sale or for personal use – either purpose is incredibly concerning.  Defendant has serious federal charges pending in Oregon. The defendant has demonstrated that she is a danger to the community and a risk of nonappearance and she should be detained.

### 1.    Nature and Circumstances of the Offense.

The defendant was helping sell fentanyl to buyers across the country.  While her co-defendant Eager appears to be the principal one who set up the vendor site and obtained the fentanyl for purposes of further distribution, defendant Melton helped him run their site like a business, she helped with mailing the packages of fentanyl to their customers, and she helped with laundering the money received.  Fentanyl is extremely addictive, it is destructive, and it is deadly.  It is a poison and just two milligrams of fentanyl is considered a potentially lethal dose for an average adult.[1]  According to law enforcement:

> Fentanyl and methamphetamine remain the primary drug threats, affecting community livability and contributing to drug-related overdose deaths and criminal activity, including crimes against persons and property in the HIDTA region.  In 2023, fentanyl was linked to 75.9% of overdose deaths in Oregon and 51% in Idaho.  Methamphetamine was present in 63.5% of Oregon's overdose deaths and 38% of Idaho's.  Together, these two substances accounted for 41.3% of overdose fatalities in both states.

Oregon-Idaho High Intensity Drug Trafficking Area (HIDTA) 2026 Threat Assessment, 2025, at 5 (https://oridhidta.org/reports).

///

///

///

---

[1]    *Fentanyl: What You Should Know*, Health Beat, Northwestern Medicine (January 2025).

**Government's Memorandum in Support of Continued Pretrial Detention          Page 14**

For Americans aged 18 to 45, fentanyl overdoses have become the leading cause of death.[2]  In 2022, within the United States, fentanyl was responsible for an average of more than 200 deaths every day and a total of 73,654 people died from fentanyl overdoses.[3]  Here in Oregon, between 2015 and 2021, Oregon experienced a 932% increase in fentanyl overdose deaths.[4]  In 2022, Oregon alone experienced a total of 839 fentanyl related overdose deaths.[5]  In 2023, within Oregon there were 1,833 overdose deaths, and of those 1,272 were the result of synthetic opioids, such as illicit fentanyl.[6]  In 2023, "Oregon had the highest rate of increase in fentanyl deaths in the nation with a one-year increase of more than 67[%], compared to a national average of 5[%]."[7]  Even with the most recent decreases in overdose deaths, both nationally and in Oregon, the death count from illicit fentanyl remains incredibly high.[8]

Even though the defendants' were advertising the sale of fentanyl around the country, they were not, in terms of volume, huge dealers.  Nonetheless, they were selling one of the

---

[2]     *DEA Administrator on Record Fentanyl Overdose Deaths,* GET SMART ABOUT DRUGS (August 17, 2024), https://www.getsmartaboutdrugs.gov/media/dea-administrator-record-fentanyl-overdose-deaths.

[3]     Are Fentanyl Overdose Deaths Rising in the U.S., USAFACTS (Sept. 27, 2023)*,* https://usafacts.org/articles/are-fentanyl-overdose-deaths-rising-in-the-us/.

[4]     *Fentanyl by State Report*, FAMILIES AGAINST FENTANYL (Feb. 4, 2023) https://www.familiesagainstfentanyl.org/research/bystate.

[5]     *Oregon Health Authority| Oregon Department of Education Fentanyl & Opioid Response Toolkit for Schools* (January 2024) *https://www.oregon.gov/oha/PH/PREVENTIONWELLNESS/SUBSTANCEUSE/OPIOIDS/Documents/FentanylOpioidResponseToolkit.pdf*

[6]     *Oregon Overdose Prevention Dashboard*, Oregon Health Authority (May 1, 2025) https://www.oregon.gov/oha/ph/preventionwellness/substanceuse/opioids/pages/data.aspx.

[7]     *Oregon, Washington see largest increases in fentanyl deaths since last year*, KPTV 12 (Sept. 26, 2023) https://www.kptv.com/2023/09/26/oregon-washington-see-largest-increases-fentanyl-deaths-since-last-year/.

[8]     *Oregon overdose deaths are down, CDC data shows,* Oregon Health Authority (May 16, 2025) ("Oregon's overdose deaths decreased 22% between December 2023 and December 2024, a trend similar to that experienced nationwide.") https://www.oregon.gov/oha/ERD/Pages/Oregon-overdose-deaths-are-down-CDC-data-shows.aspx.

**Government's Memorandum in Support of Continued Pretrial Detention          Page 15**

deadliest drugs that is out there.  Drug dealers like the defendant are exactly the people Congress warned us about and why they created the presumption of detention in these cases.  Drug dealers historically make their living from selling drugs – as these defendants apparently did – and are prone to go back to it when they are released from custody.  That high risk of pretrial recidivism warrants defendant's continued pretrial detention.

### 2.    Weight of the Evidence.

The weight of the evidence against the defendant is extremely strong and supports her continued detention.  The proof against the defendant is summarized above – the defendant helped run a site that was selling fentanyl and on three occasions they sold fentanyl, marketed as "China White Synthetic Heroin," to an undercover HSI agent based in Portland, Oregon.  When Investigators executed the search warrant on their residence the defendants were caught in possession of approximately 361 gross grams of fentanyl and drug packaging materials.  When she was interviewed, the defendant admitted to helping her boyfriend run the vendor site WRSEH10 "like a business," that she helped with the mailing of packages to their customers, and that she helped with converting the cryptocurrency that customers used to buy fentanyl into fiat currency (U.S. Currency).  The case against the defendant is strong and she should be detained.

### 3.    History and Characteristics of the Defendant.

The history and characteristics of the defendant also warrants her pretrial detention.  Although the defendant does not have any criminal history, she actively tried to evade apprehension on her federal arrest warrant by running and hiding on the roof of her residence.  There was no reason for the defendant to try and hide form the Investigators unless she knew of her arrest warrant and was trying to evade apprehension.

**Government's Memorandum in Support of Continued Pretrial Detention          Page 16**

Additionally, while defendant claims she has been working, her mother reported that she was unemployed.  In 2024, the defendant admitted to the Investigators that she used drugs.  To U.S. Pretrial Services she admitted to using heroin a few times a month and last used a day or two prior to her arrest.  Defendant, however, told U.S. Pretrial Services in New Jersey that she does not feel she needs any treatment.  According to U.S. Pretrial Services, defendant's mother was unaware that her daughter had any substance abuse issues and does not think her daughter would benefit from treatment.  When she was arrested, defendant Melton was in possession of numerous wax folds that contained approximately 18 gross grams of fentanyl.  Given that the defendant does not claim to use fentanyl, but rather heroin, this raises additional concerns about why she had the fentanyl.

The defendant is not in a stable situation and her parents' efforts to help her evade apprehension by law enforcement does not offer comfort that they will help her make it to her future court appearances in the District of Oregon.  While the government believes the defendant does need drug treatment, continued placement at her parents' residence, even with electronic monitoring, is insufficient to address her potential danger to the community (continued drug dealing) and risk of nonappearance.  If the defendant simply decides to cut off any electronic monitoring bracelet and once again attempt to flee, she can.  Given her history, the defendant presents an unacceptable risk of nonappearance and she should be detained pending her transfer to the District of Oregon.

**4.      Nature and Seriousness of the Danger to the Community.**

The defendant's drug dealing activities, by themselves, are extremely serious.  Given the presumption of detention that comes along with the charges, Congress has recognized the very serious risk that drug dealers pose to the community and their risk of going back to drug dealing

**Government's Memorandum in Support of Continued Pretrial Detention           Page 17**

even while on pretrial release.  There is simply no condition or combination of conditions that the Court will impose that will sufficiently mitigate the risk that the defendant will go back to distributing drugs within the community.  The defendant should be detained.

### Conclusion

For the reasons set forth herein, we respectfully request that the Court detain the defendant and find she poses an unacceptable risk of non-appearance at future court hearings in the District of Oregon and that she is a danger to the community.

We ask the Court to find that:

- The charged offenses create a rebuttable presumption in 18 U.S.C. § 3142(e) that no combination of conditions will (1) reasonable assure the safety of the community and (2) reasonably assure the appearance of the defendant as required.

- The defendant has not rebutted, by sufficient evidence to the contrary, the presumption of detention provided in 18 U.S.C. 3142(e).

- Furthermore, due to the nature of the offenses and the extreme dangers posed by the defendant's fentanyl trafficking, there is no condition or combination of conditions that will reasonably assure the safety of other persons and the community if the defendant were released.

- Due to the weight of the evidence and the defendant's personal history and characteristics, including her active efforts to evade apprehension by law enforcement and the potential penalties she is facing on the current charges, no condition or combination of conditions will reasonably assure the appearance of the defendant at future court hearings in the District of Oregon as required if she was released from custody.

Based upon the above findings, the defendant should be detained pending trial.

Dated:  November 21, 2025.                          Respectfully submitted,

                                                    SCOTT E. BRADFORD
                                                    United States Attorney


                                                    /s/ *Scott Kerin*

                                                    SCOTT M. KERIN, OSB # 965128
                                                    Assistant United States Attorney

**Government's Memorandum in Support of Continued Pretrial Detention**          **Page 18**